Morning. The first is number 18-3011, Adams v. Zimmer US Inc. et al. Mr. Becker and Mr. Jones. May it please the Court, I'm Chip Becker here for the Plaintiff Marilyn Adams. With me at counsel table is my colleague Andrew Leidacker and Judge Ambrose. If I may, I would appreciate three minutes for rebuttal. Thank you very much. This case calls on the Court to interpret and apply the Pennsylvania discovery rule. I mean the first the first dumb question that anybody's going to have on this case is why wait so close to two years? A very good question and one for which I don't have a good answer, your honor. So I mean this was filed what February 10 of 17? Yes. And the other side is saying at the latest come February 9 of 15, they were on inquiry notice and the argument against that is, hey gang, no. The doctor really didn't know until the surgery on February 12 that it was the defective product as opposed to a reaction to the metal called certainly it was not until the surgery that Dr. Varela and Dr. Varela opened up Ms. Adams and saw gray muscle tissue, gray dead muscle that and which which was indicative of of metal dissolving and corroding into the body. Almost like shrapnel. Yes, that he that he realized that her condition was far beyond anything that he expected and that is what he reported to Ms. Adams. Prior to that time, prior to that time the the and there was a long course of of treatment here, most of which involved an investigation into into inflammation or infection and it was only it was only in January that the concept ripened that she might be experiencing what the doctor sometimes spoke of as adverse tissue reaction and other times spoke of as metalosis. The central point for for purposes of the statute of limitations analysis is that is is that while I would agree that by January, I think the record reflects that by January 30th 2015, that is the date by which it appears based on the record that Dr. Varela said to Marilyn Adams, I believe that you have adverse tissue reaction. I believe that you have metalosis. The question then from a discovery rule standpoint arises. But at that point, what did that mean? So saying at the 29th or 30th, whenever it was, we need to do some further investigation and we may have to go in and do some type of revision. Yes, because yes, he wanted to do a revision because she had had a dislocation and he believed that there was wear. He had done an x-ray. He concluded based on an x-ray that there was this adverse tissue reaction as well. But but what he was expecting was was was was wear in a different part of the of the implant than actually occurred. And what he certainly was not expecting was the extent of the of the damage that he actually observed. And here's the question that I have. Yeah. It seems to me that when you think about January 30th, let's assume for a moment, I know this is not your version of the facts, but let's just assume for a moment that she knew on January 30th you'd be out. No, I don't think that's right. Oh, OK. Yeah. Yes. No, that that that proposition is not correct. OK. OK. The reason is that that under Pennsylvania law and and and certainly there have been many. Well, actually, let me let me let me reframe the hypothetical a little bit, just so we're definitely on the same page. OK. On January 30th, she knew that it was the Zimmer device that the Zimmer device had to be removed and that it was clear. That's that's my revision. She if she knew that on January 30th and then this happened in February, the filing was in February of 17 on whatever date it was, I think the 10th. Right. Yeah. February 12th. Well, yeah. If those are the facts, would she be out? Still no. OK. Still no. And the reason is that under Pennsylvania law and and as reflected, by the way, in decisions of of of the Third Circuit and there's the the Debbie case, Judge Amber, in which you were involved. That's a 2003 case. Judge Sirica, you were involved in the Boas case from 1991. There's a long line of cases that a plaintiff cannot be charged with an understanding or an appreciation of her condition that goes beyond what her physician what her physician knows and understands. This is this is a case where you have a plaintiff who is in a longstanding treating relationship with a physician. It's a personal injury. The physician was her was was absolutely her trusted advisor and guiding her. And yes, he does appear to have said she doesn't remember it. But but he there is there is record that he told her, I think you have adverse tissue reaction. I think you have metalosis. The question then arises, what does that mean? What did the doctor think that that meant? If so, we can we know what we know what the doctor thought that he meant when he said those things. And I can read to you from his deposition. What he says is that adverse tissue adverse tissue reaction refers to the idea. Could you reference the page, if you will? Sure. It's page 13 of Dr. And I will give you the citation to the Joint Appendix, which is page 217 of the Joint Appendix. So Dr. Berberilli tells her you have adverse tissue reaction. So adverse tissue reaction, he says, is used to describe when a patient has an unusual response around a site that's typically caused by an offending factor. That factor can be metalware debris. So when a patient has when a patient has a response, he describes this in terms of the patient's response. Likewise, when he defines metalosis, which he does on the next page of the Joint Appendix, he defines metalosis as it can be. It depends on who you're talking to. But it's typically it's metalware that then causes a reaction to the surrounding tissues. But what he also goes on to say is it all depends. Metalosis all depends on the patient's own reaction to the presence of metalware. So the point that I want to emphasize for your honor's consideration is that in the context of the discovery rule, and we know the Pennsylvania discovery rule provides that in the context of a latent injury or, and this is the scenario here, where there's an injury where the cause is not apparent, the discovery rule holds the statute of limitations until the until the plaintiff knows or in the exercise of reasonable diligence should know that she has suffered a legal injury caused by the conduct of another. Now, we can talk about the legal injury side of this, about whether she even understood that she had an injury as distinct from simply a poor outcome. But as to this side, as to the metalosis side, that's really getting to the factual cause. And this is what the district judge did. The district judge concluded that Dr. Vervarelli's saying to her, you have metalosis, was evidence of factual cause. But what he believed, when Dr. Vervarelli was asked, what do you think that means? What he said was, I see metalosis as referring to the patient's experience. I see adverse tissue reaction as referring to the patient's reaction. He doesn't define this or describe this in any way, shape, or form as implicating the design of the product, as suggesting that there's a defect in the product. The message that he is delivering, based upon his understanding of even if you don't fully believe that, that is a reasonable inference from the evidence. That's a reasonable inference from his explanation of what he meant. Are you saying that that is the only inference, reasonable inference, that can be drawn? No. I want to say that I am very respectful of this argument. This is not a frivolous argument that Zimmer has advanced. It's an argument that has a foundation in the facts. It has a foundation in the law. It's a solid argument, and that's fine. But in conceding that there is a meaningful argument and a credible argument that they are making, and in readily conceding that a jury might be persuaded by that argument, I am not also conceding that summary judgment was proper. There are different perspectives that people can bring to this story. A jury could conclude that she knew enough such that she was on notice, and the statute of limitations was triggered by that time. But when you take into account the Pennsylvania law, taking as backdrop Pennsylvania's law, really well-established law, from the Fine case, the Wilson case, the Niccolo case, and the very recent Carlino case that I presented to your honors yesterday. What's the reasonable and what other reasonable inference could there be? What else could a jury conclude? A jury could conclude that she did not understand that she had an injury, that her condition implicated the design of the product until, at a minimum, after Dr. Gershman's death. It seems that there are only, I'm sure there are more, but in my thinking of it, and you'll help me if I'm not thinking of this the right way, there are three things that one could think of. My doctor's messed up, something's wrong with the product, or I got an infection. Now, maybe there are other things that are possible. Let me add one other. And if you think it's an infection, it could be one of the other two, right? The infection could be because there's something wrong with the product, or the infection could be my doctor messed up. But the question I think that both Judge Amber and I want to get at is, based on what she knew on January 30th, what's the reasonable inference? In the record, not the record, the deposition of your client, she says she knew something was, she knew it was the Zimmer, she knew she didn't want a Zimmer device back in, and that she knew, well, she was equivocal about whether she knew it was a Dupuis or not. Um, so my question to you is, what other reasonable inference is there, but that she understood that it was something to do with the device? She, she also says in her deposition that it was not until after the February 12th surgery that Dr. Vervarelli said to her that she had an understanding that her condition implicated, implicated the product itself. Now, in the context of her deposition, looking back, she says, I didn't want a Zimmer product, and there might be all kinds of reasons why she didn't want a Zimmer product. But it doesn't, it doesn't follow as a matter of law that at that time, the only, that at that time, as a matter of law, she had knowledge that she had a legal injury, that her right to institute suit had, had, had ripened. And that her injury was caused by, by the conduct of, of Zimmer, right? Now, recognizing that we don't have to get all the way to tortious to knowing the exact nature of the tort. Fine, but let's just deal with what she said. So I'm reading from appendix 167, page, the appendix and the page side are the same. It's 167 of the appendix and it's 167 of the date, right? And at line 21, she's asked for context. Let's go back to line 16. But you knew it wasn't going to be a Zimmer device. Objection, and the direction is you can answer. Line 21, yeah, I knew it was not going to be a Zimmer. Question line 22, yeah, would it have caused you concern if he said he suggested using another Zimmer device? Another objection, but the answer is given. Line one of page 168, yeah, I would have objected to it because if he was taking one out, I didn't want him to put another one back in. And I'm conceptually, you know, that this was referencing January 30th. So if she knows that the Zimmer's coming out and she doesn't want another Zimmer put back in, is it unreasonable to infer from that statement that she knew it was the Zimmer device? It is a conclusion you can reach, but it's also, you can also conclude that here she is in her deposition years down the road after she's filed a lawsuit against Zimmer and that now she's applying, she's using her retrospectoscope to reach an understanding about that product at the time. And Judge, if I may, if we can go back up to page 166 of her deposition where she says, I knew there was a problem with my hip. I knew there was a problem with my hip. And a fair reading of this record is that she knew that she had a bad outcome. She knew that she was having problems. This, by the way, is exactly what happens in the pelvic mesh cases. In the Carlino case is an example where women are implanted with pelvic mesh. They have pain at the site of the mesh. The mesh can sometimes erode or extrude into their vagina, into other pelvic organs. And there are all kinds of problems then that ensue. And the physicians are trying to, and this is exactly what happened in Carlino. This is exactly the story in Hammonds. Everybody understands that the patient is having a problem with the mesh. And there are surgeries and there are revisions and there are efforts to manage the problem. What doesn't follow, and the reason why summary judgment was denied in Hammonds, the reason why JNIV was denied in Carlino is because it doesn't follow that understanding that you're having a problem with an implant, that you know as a matter of law that the implant is the problem. This, Ms. Adams understood, Dr. Vervarelli understood that she was having a poor outcome and that there were difficulties downstream of her hip implant, which were investigated as bursitis, as inflammation, as infection, which ultimately over years of inquiry crystallized into the idea that there was adverse tissue reaction or metallosis. But even Dr. Vervarelli, and remember, we're starting, our operating framework is we do not impute to the plaintiff more understanding or awareness than the physician himself or herself has. And this physician's understanding was that metallosis and adverse tissue reaction, as he testifies in his deposition, which we have to view in the light favorable to the plaintiff for purposes of this exercise, he understands those concepts as referring to the patient's an unusual, an unfortunate, but essentially normal reaction that the plaintiff may have to the product that has to be managed. That's why, by the way, he wants to do the revision. He doesn't want to do the revision because he thinks that there is a problem with the implant implicating design defect. He wants to do the revision because he's thinking to himself, and this is what he testifies, this patient is having a poor outcome, and I need to kind of manage that outcome. And that's why we're going to do this. It's only when he does the surgery that he looks at, he opens her up, and he sees that there is corrosion and there's degradation and that the implant has failed. And it's only at that point that there is an expression to her, which I think could trigger as a matter of law a conclusion that she had an understanding that, yes, she had surgery that there is an awareness that her condition implicates the design of the device. Up to that point, up to that point, she is in the category of the patients in Pennsylvania cases such as Fine and Wilson and, more recently, Hammonds and Carlino. She is in the same position as plaintiffs in cases of this court, like Debiek and Bohus, where the plaintiff has a poor outcome. The physician is working with the plaintiff on managing that outcome, but it's not until later that it can be said as a matter of law that the plaintiff understands, or should understand, that her condition is not simply bad luck, but implicates, in this case, the implant itself. So reasonable inference is not the way to think about when the clock starts? Because I'm looking at January 30th, or I should say one way to look at January 30th is that's a reasonable place to start the clock because she had an understanding that it's the Zimmer device. Now, I understand that on January 30th, there's more than one reasonable inference, right? But tell me if your understanding of the law is it has to be more definitive than a reasonable understanding. You'll forgive me, but if there's a reasonable, I mean, I think I heard you say there might be multiple reasonable understandings. Well, I'm so sorry. There could be more than one reasonable inference that one could draw. I think what you're saying is on January 30th, one reasonable inference is that it's potential reasonable inferences, and that because of that, you really have to look at what did the doctor know, and that on January 30th, the doctor was not definitive in his understanding that it was the Zimmer device, and that didn't come until after the surgery. That is certainly a reasonable inference, and one, let me suggest, that I think requires the denial of some of the judgment. And what I would say more broadly is that we are not operating here in a binary universe. It's not, this is not, you know, cross motions for summary judgment where either it's us or it's them. No one was asking the district court to determine definitively, and you do not have to determine definitively whether the summary, excuse me, the statute of limitation bars the claim definitively or the discovery rule definitively does not, applies so that the claim is not barred. Under Pennsylvania law, there's a broad middle ground, which is where there, which is the space for a jury because under Pennsylvania, and indeed Pennsylvania law says that the ordinary rule, and I'm not going to pound on the podium and say it's for the jury, but the Supreme Court does say multiple times that the ordinary rule in the context of discovery rule analysis, certainly in the Wilson case among others, that fact issues are for the jury. And the reason the Supreme Court says that is because there are all kinds of ambiguities inherent in the discovery rule analysis, like, and this is right out of the Supreme Court cases, like confusion about whether a plaintiff's physical condition is a temporary condition or reflects a legal injury. There are other considerations. For example, the physician's inability or unwillingness or inability to determine the plaintiff's medical condition or the cause of that medical condition. The individual circumstances of the plaintiff. In the recent Niccolo case, the Pennsylvania Supreme Court made a point of emphasizing that we should not look at facts in a vacuum, so that even if Dr. Vervarelli said adverse tissue reaction on January 30th, we should not look at that fact in a vacuum, but should consider the entire course of conduct and recognize that this is a treatment process that's been going on for years. Dr. Vervarelli had gotten it, I don't want to say wrong, for years, but had been investigating for years. And while it might be said that in January, he was advancing a proposition for her, we should not use our, what I'm calling the retrospective scope, we should not apply 20-20 hindsight. And this is the Supreme Court saying, I'm sorry. No, no, I assume the district court said once Adams knew for certain that Dr. Vervarelli needed to remove the Zimmer device, and that was January 30th, she had received enough facts to make the connection between her injury and the Zimmer device, and then said, and no reasonable juror could conclude otherwise. And so your position obviously is, yes, a reasonable juror. Yes, absolutely, a reasonable person could conclude otherwise based on all the considerations described by the court, and based in particular on Dr. Vervarelli's own understanding of what adverse tissue reaction and what metallosis was, which he defined as a form of unfortunate patient reaction, unfortunate bad luck, but did not define in terms of something implicating the design of the device. And while I'm not going to stand here and say that I'm entitled to a directed verdict on these issues, and while I've already said that I think the argument that's been advanced is a credible and important and serious argument, I would add that arguments like this are routinely advanced in the national litigation, and they are denied in cases such as Hammond's and Carlino because they don't get quite over the line, because there are Let me see if I can just figure out what your theme is. What knowledge does the law require under the discovery rule in order to start the two-year clock ticking? What knowledge on behalf of your client does the law require in order to start the two-year clock ticking? In the fine case, the Supreme Court. In this case. How do you want us to come out? What rule of law do you want us to say applies based from Pennsylvania in order that the clock starts ticking not on January 30th, as the judge said, District Judge, not on February 9th, but rather on February 12th at the earliest? Let me think about how to frame that. Well, maybe I can frame it. Yes. That she knew prior to February 12th that there was a problem that she was having as a reaction to the device. She did not know that the product was in any way defective until February 12th at the earliest. Yes, and I would soften it just a little bit, because in fairness to the defendant, the discovery rule in Pennsylvania doesn't require the plaintiff to understand that there has been, to understand the specific nature of the tort. So you're a doctor attempting, go ahead, why don't you. I would say that it's not until after the surgery. It's not until after February 12th that she understands that her condition is not simply an unfortunate reaction to the product. But implicates the product, but implicates the design of the product itself. That's what I'm saying. Okay. Well, we're here for Mr. Jones. Thank you. Do I still have an opportunity to rebut? I certainly was here for a while. Thank you. I appreciate your time. May it please the court. I'm Bruce Jones. I'm joined by my colleague, Dana Becker. We represent Appellee Zimmer U.S. Inc., Zimmer Biomed Holdings Inc., Zimmer Inc., and Zimmer Surgical Inc. Your honors, the district court correctly granted summary judgment on plaintiff's based on Pennsylvania's two-year statute of limitations. Well, let's just pick up where we left off. Okay. She had a duty at some point to do an inquiry as to what the cause of her pain and her problems were. And she was doing that with her doctor. Do you have any question that she was not proceeding with due diligence? In inquiring? In trying to find out what the problem was with her pain that was post-surgical in 2015. Through January, January 2013 through January 2015, she and her doctor were pursuing. Well, in January, whatever it was, she was trying to find out what the cause of the problem was, as her doctor was as well. Correct. And the question then becomes, was the cause, was she the cause in effect because her body was reacting negatively to the implant in her hip socket? And it doesn't appear that there was anything that was saying that that was, it was the product itself until sometime after, on or after February 12. Well, Your Honor, the product doesn't have to be perceived to be causing the problem. I suggest that counsel for the plaintiff is setting the bar too low. Pennsylvania has an intentionally narrow discovery rule and places a greater burden than most other states. The statute, excuse me, the connection only has to be to the product, not to a defect in the product or to negligence. When did she have some suggestion that the Zimmer's product was the culpable thing here in her allegations? When did, when did she first know that the Zimmer product might be the problem and not something called metalosis? Well, metalosis is the problem. Metalosis is a reaction. To the, to the Zimmer product. I mean, according to, I think Dr. Brip does, you know, the footnote on page six of Dr. Testimony, page six of Dr., of the judge's opinion, it's metalware that causes a reaction to the surrounding tissues. Correct. And the, the, the point there is that it had, you have to have both components, the tissue and the metal, which is the implant in order to have that reaction. So the connection, metalosis is in and of itself connecting the. Yeah, I could, but metalosis could be, I'm having a reaction to this particular, I'm having the reaction to the product. It's not the product's fault. It's my, it's my own internal system. That may, it may be idiosyncratic, but the fact is you don't have to be able to blame the connection. All you need under this court's decision in the Divya case, as you put it, an unrebutted suspicion that a claimant has a specific disease, which is an injury caused by another, is sufficient to start the clock. You don't need, and as it was also stated, awareness of the injury and suspicion of its cause are enough to start the clock. But if Carlino is correct, the case that was given to us yesterday, if it's correct, this is really a decision for the jury to make. No, the difference in the Carlino case, in the Carlino case, there was conflicting evidence about whether the, whether multiple doctors told the plaintiff that her injuries were a result of a complication of the surgery or a complication of the product. Here, there's no question that as of January 30th, 2015, Dr. Varelli had told her, in fact, Mr. Becker stood up here and said just a moment ago that as of January 30th, he had told her that she had an adverse tissue reaction and metallosis and the implant had to come out. But not necessarily that there was a defective product. Correct, and that's not necessary under Pennsylvania law, as the Debye case makes clear as the, as the Wilson case. If I may quote from the Danish case, which is quoting Wilson, once the plaintiff is on inquiry notice, that is actual or constructive knowledge of at least some form of significant harm and a factual cause linked to another's conduct. There's no mention of negligence or defect. Well, I thought Wilson's case would speak of a connection between, as you say, the injury and the conduct of another. But there must be some suggestion at the outset that the other's conduct, or in this case, the other's product was the culpable, was culpable. Culpability does not enter into it, I suggest. To complete the quote, it says, without the necessity of notice of the full extent of the liability, the fact of actual negligence or precise cause. What is necessary is a suspicion, an unrebutted suspicion. And on January 30th, that's what she had. She had been told that she had the adverse local tissue reaction. She'd been told she had metallosis. She'd been told that the implant had to be replaced. And she'd been told that the one other possible cause, infection, had been ruled out. But if the implant was fully functional and worked as it was supposed to work and there was no problem with it, that's one thing. But if the implant, I don't see anything in the record that indicates that the implant itself was the problem until on or after February 12th. Well, she said, she knew that... She knew she was having a problem. She knew she was having problems, and she knew that those problems were connected to the implant. That's what the local adverse tissue reaction diagnosis, that's what the metallosis diagnosis all told her. But that's the conclusion that you're drawing from that fact being told to her. When you talk about actual or constructive knowledge, you would agree, based on her deposition testimony, that you couldn't argue credibly that she had actual knowledge because she said, number one, I don't remember him telling me. There's very little that she remembers. And so we're really in the constructive knowledge realm. You'd agree with that? Well, recognizing that the burden is on the plaintiff here to establish the applicability of the exception. And that's an important factor here. She has the burden of proving that she did not know and could not have known as of February 12th or February 10th, 2015. She doesn't remember that there are several places in the deposition where she doesn't remember being told about metallosis. I'm pretty sure that when asked if she understood metallosis, there was, I don't remember. I could be wrong on that. You'll correct me if I'm wrong. So how do we get to the next step? I understand the burden that you say is on her. I totally get that. But if she doesn't admit that she has the knowledge with regard to metallosis, and as your adversary said, there's nothing definitive in the knowledge of Dr. Vervarelli until he goes in. How do we make the steps of the quote that you've just made from Wilson? Well, I would point out that there is nothing contradicting Dr. Vervarelli's testimony that he told her that she had metallosis, that it was connected to the implant and that the implant had to come out as a result. But I would also point you to the consent form that plaintiff filed, Mrs. Adams filed on February 9th, which specifically mentioned metallosis. Let me tell you, if you can read that as metallosis, God bless you, your eyesight's really good. Now, I have that in front of me. And, you know, we could have an interesting conversation about this. But if I was having to discuss a medical condition with someone and someone put this in front of me and I looked at that, that's a tough one to say that says metallosis. I would also point out that plaintiff has not argued that she did not read it, could not read it. She admits that she signed it and her only dispute is what Mr. Becker has said, is that metallosis is not enough. And we submit that metallosis is in fact enough, whether it's gotten from that consent form or whether it's obtained from all the conversations she had with Dr. Vervarelli. How do you distinguish fine? You did that at one point. The fine case? Yes, sir. Well, the fine case was, it was different in a couple of different ways. It was a dental malpractice action. And there was, the plaintiffs in those cases, in that case, suffered numbness in their cheeks. And the dentist kept saying it was a side effect of the surgery. Right. And they had, in fact, competing versions of what was going on. The dentist kept reassuring them that, no, no, no, this is not permanent, it will go away. And it eventually didn't go away. And the trial court relied on the uncertainty introduced by the dentists themselves to say, no, no reasonable person should have been in inquiry at that early date when your dentist is telling you, no, everything is fine. There's no problem here. Here, in contrast, at least by January 30th, 2015, Dr. Ververelli no longer had any doubt. As Mr. Becker said, he was the trusted medical advisor. He came in and had gone, spent two years researching and trying to diagnose this. He narrowed it down to two things, adverse local tissue reaction and infection. He confirmed adverse tissue reaction on January 7th. He excluded through a test infection as a possible cause. He reached a conclusive differential diagnosis that it had to be the metallosis, the adverse tissue reaction, resulting from the implant. And he said, it's got to come out. And he conveyed all that information to the plaintiff. And none of that is disputed. When I look at the Wilson and the Fine cases, it almost seems like what they're saying is you got to use your common sense. It almost, it also seems when I look at Wilson on 964 Atlantic 2nd at page 363, that there's limited relevance to the inquiry notice in situations where the plaintiff is exercising reasonable diligence but remains unaware of the cause of her injury. And I don't see anything in the record that notes that the cause of the injury was a defective or possibly defective product until the date of the surgery. And again, that is not the standard under Pennsylvania law. It doesn't have to be related to a defect in the product. It just has to be related to the product. And the metallosis diagnosis makes that connection, as does the local adverse tissue reaction. She knew that her tissue was having a reaction with the product. She said, there's a problem with the knee. And if you put in another one, I don't want another Zimmer because there's a problem. So that comes back to Carlino that the, I think the surgery was what, 08 or so or 09, 10. But the person, two years passed, way passed. And the woman is watching an advertisement on television that says, hey, you may have a pelvic mesh defective product. And then goes to a lawyer and brings the case way after the statute has passed. And the court said, Superior Court says that's allowable because she didn't know it was a defective product until there was some inquiry that she began after seeing this advertisement in 2013 on television. It's not that she didn't know it was a defective product that underlies Carlino. It's the issue that her doctors were telling her, there are two possibilities here. One, this could be a complication of surgery itself. Or two, it could be a complication related to the product. And because of that uncertainty. To the product? Excuse me, to the product or to her reaction to a product that may not be defectively designed by a manufacturer? It would be to a product that is not necessarily defectively designed. The connection needs only be to the product or to the conduct of the defendant, not a connection to a defect in the product. And in Carlino, the fact that there was, there were two alternatives that she had been told by her doctors that hadn't been resolved before the statute of limitations began to run was what the court based its decision on. Here in contrast, there is no doubt that her only doctor was telling her one unambiguous thing on January 30th, 2015. You have metallosis. It results from the adverse local tissue reaction. And you've got to have the thing taken out. And if I'd also point out, that is exactly what the complaint claims is the design defect here. If you take a look, it's quoted on page 12 of our, of Cook's brief. Paragraph four of her complaint, her second amended complaint. Plaintiff says, the unreasonable risk of pain, swelling, metallosis, adverse local tissue reaction, and or the need for early revision surgical intervention. Those are all things she knew on January 30th. All three of those. When did, you're saying, especially as I understand your theme. As long as she is, knows that there's a connection between the product and her, her symptoms, that begins the clock ticking. And they're saying that not until you have some inkling that the product is defective. The product itself is defective. Does the clock start ticking? Am I understanding both sides correctly? You're understanding my side correctly. Yes. Let's hear back from rebuttal from Mr. Decker. Thank you. You're welcome. Mr. Jones described Pennsylvania's discovery rule as narrow. And that word is used in the cases. But, and it's not a word that I think we really know what it means. What we know is what the discovery rule says. And we know how it's been applied by the Pennsylvania Supreme Court. In the fine case, which was discussed in the Wilson case and others, the Supreme Court says over and over, knowledge of a symptom, knowledge of your physical condition is not knowledge of injury as a matter of law. The Supreme Court also says in Carlino, well, that wasn't the Supreme Court, that was the Superior Court in Carlino and Hammonds. The Supreme Court, certainly in the Niccolo case and others, says that knowledge that you're having, knowledge that you're having a reaction to, to an implant is not knowledge of causation. Let me ask you a question. Your adversary said that by January 30th, she knew through her doctor that it wasn't infection. Is that right? By January 30th, the record reflects that Dr. Vervarelli had concluded that there was no infection. And his representation to her by that point, as I understand the record, is that she had what he described as adverse tissue reaction and metallosis. Okay, wonderful. So your adversary also says, okay, if on January 30th, she knew it wasn't an infection, she doesn't have to know that it was, that the device was the absolute, that's not the words he used. Right, yeah. She doesn't have to know that the device was definitively the causation. He probably put it more articulately than that. But answer that point if you would. Well, I think we come back to the record. We come back to what Dr. Vervarelli thought adverse tissue reaction was. And the way he described it in his deposition, which we have to view in the light favorable to the plaintiff, he described that in terms of the plaintiff's response. So he does not in any way suggest, in his understanding of adverse tissue reaction or of metallosis, he doesn't suggest anything intrinsically about the product. What he is suggesting is that she is having... Does he have to? I'm sorry? It doesn't have to. No, well... Because my understanding, and I could be wrong, but my understanding of... He does not have to say... I'm so sorry, one second. My understanding of your adversary is that neither she, your client, nor he, the doctor, have to come to a definitive understanding that it's the Zimmer product before the clock starts. Well, he does not have to say to her, you have been implanted with a defective product for which you can sue under Pennsylvania law for strict liability. He doesn't have to say that. But he has to say enough from the standpoint of... Not from the standpoint of making a jury argument. And let me say that this is all... I think what's been offered is a beautiful jury argument, which a jury might be persuaded by. But for purposes of judgment as a matter of law, he has to say enough that you can conclude, that the district court can conclude as a matter of law, that she had a reasonable basis for understanding that she had an injury caused by the conduct of another, right? Stop one second. Now, she knows, as in the deposition testimony that I read to you earlier, that it's not going to be a Zimmer. The replacement's not going to be a Zimmer. It's going to be a Dupuis. So obviously, we have to impute that knowledge to the doctor. How would she know it's a Dupuis? So if the doctor knows on January 30th that it's got to be another product, that he's got to use another product, then why isn't the fact that both he, the doctor, and she, the patient, know that it's got to be another product enough? I don't recall the record as the doctor verbally saying that he had to use another product. I think he decided to use another product. Well, what she says is, I wanted another product. He told me it was going to be another product. And I wouldn't let it be anything other than another product. Just to sort of refocus, if I might, for one second. She said, this is on page 167 of the DEP and 167 of the appendix, where there's a discussion of the Dupuis. I think he, did he tell you that he was replacing it with a different product, different manufacturer? Yeah, he put in a different manufacturer. Did you know prior to the surgery what the brand of device that you were being implanted? Yes. Okay, answer. But I didn't, but I don't, again, I don't remember what he put in. I think it was a Dupuis. But she knew beforehand, and he told her that it's going to be something different. So doesn't the fact that everybody knows it's going to be something different, carry some weight in this discussion? I, does it carry some weight? Yes. I think that that makes sense. And you think that's a fact issue? That makes, that observation makes sense to me, that that would carry some weight. The question in my mind is whether the record here, viewed in the light favorable to the plaintiff, and recognizing that Mr. Jones can point to deposition, segments of the deposition. You've pointed to some segments of deposition. I can point to some segments of deposition, right? Do we get to a place where we are clearly over the line, where summary of judgment must be granted? Or is this like one of those sideline throws in a football game where the wide receiver is close to the line, but he still gets two feet down before he goes out. And I'm not... It's a catch either way. It's a catch either way. And my sort of posture here is one of, as I've said earlier, is one of appreciating that the argument that has been made by Zimmer is a meaningful argument. Just as the arguments that have been made in the Pelvic Mesh litigation, in the Carlino case, in the Hammonds case, are meaningful arguments that have a factual foundation. But they don't get across the line to justify summary judgment and to pour these cases out of court because of the fabric of Pennsylvania's discovery rule law. Does that not meet constructive knowledge? Well, she knows, viewing the light in favor of... And she knows that she has been told that she has adverse tissue reaction on January 30th. She's been told that. Under the Niccolo case, we have to view the entire course of conduct. We have to, under Fine and Wilson and many other cases, we have to also bear in mind that this process is unfolding. Her understanding is unfolding within the framework of a patient-physician relationship, where she cannot be imputed to have any understanding beyond that of Dr. Ververelli himself. And where Dr. Ververelli understands only that, as he says in his deposition, that she is having a reaction to the product, which, by the way, Zimmer itself warns of in their instruction for use. There's a reference to metalware and sensitivity in their IFU. So where he does not frame for himself, let alone frame for her, anything other than this is a poor result, this is unfortunate, this is something that sometimes happens, this is something that we have to work with. We are in essentially the landscape of Carlino and all of these Pennsylvania Supreme Court and Superior Court cases where you have some confusion, that's the word that the Pennsylvania Supreme Court uses, where you have some degree of confusion as between whether the patient's experience is temporary and workable and something that the doctor can get the patient through, or reflects a legal injury caused by the conduct of another. And Judge Greenaway, you asked earlier whether there was a reasonable inference that could be made, and I'm not going to stand here and say that there is no reasonable inference that a jury could not reasonably conclude that she filed her lawsuit too late. A jury could reasonably conclude that, but I want to suggest for your honors that based on this record, especially in light of Dr. Verbarelli's perspective and Dr. Verbarelli's total command of that patient-physician relationship such that she can only be imputed to know what he understands, that there is not enough, there is also a reasonable inference that she did not know enough, did not understand enough until after the surgery, until after Dr. Verbarelli opened her up and said, oh my gosh, there's something completely different that's going on here, and has that conversation with her, that as a matter of law, it can be said that summary judgment must be granted. I understand that we're close to the sideline. I get it. But I don't think we're out of bounds. By the way, I think in the NFL, if you get pushed out, you can't have a catch. And Judge Ambrose, if I may... I apologize, you have to get one foot down. Judge Ambrose, if I may, my perspective, if I can just continue that analogy, my perspective here is that the judge, is that the district judge, who clearly had great intent, you know, was trying very hard to get to this, and looking at this very closely, made two slight errors that guided this case out of bounds when it should have remained in bounds. The judge said that her knowledge of her symptoms was knowledge of injury, and for the reasons we've discussed, I think that that is just too strong. That's not a conclusion that you can reach under Pennsylvania law in light of cases like Fine and Wilson. That was one slight mistake. And another slight mistake was, he said that her, the representation from Dr. Verbarelli that you had vaporous tissue reaction, was knowledge of factual cause. And I get it. There's multiple ways to get here, but he pushed this a little bit too far to the outside, and pushed her out of bounds, and maybe she'll be out of bounds. Maybe a jury will find against her. All right. Thank you very much. Thank you to both counsel for being with us. Thank you all counsel for being with us. We'll take the matter under advisement, and we'll call.